IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Elzie Grover Williams, III, ) | |
| ) | Civil Action No. 6:15-3663-TLW-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on July 18, 2012, alleging that he became unable to work on May 25, 2012. The applications were denied initially and on reconsideration by the Social Security Administration. On March 28, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and his attorney appeared at a hearing on March 20, 2014, considered the case *de novo*, and

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

on May 6, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on July 14, 2015. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.
>
> (2)    The claimant has not engaged in substantial gainful activity since May 25, 2012, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq*. and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: coronary artery disease status post CABG and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920 (c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he is precluded from climbing ladders, ropes, and scaffolds, but may occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. He must avoid concentrated exposure to extreme cold, heat, and humidity, and all exposure to hazards. He is limited to understanding, remembering, and carrying out simple instructions with rare public contact.
>
> (6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7)    The claimant was born on September 5, 1967, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9) Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from May 25, 2012, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

*v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 44 years old on his alleged disability onset date (May 25, 2012) and 46 years old at the time of the ALJ's decision (May 6, 2014) (Tr. 35). He has past relevant work as a farm work supervisor (Tr. 25). The plaintiff testified at the administrative hearing that he went to regular classes in school, left school in the ninth grade, and never obtained a high school equivalency diploma after leaving school (Tr. 35).

On May 30, 2012, the plaintiff presented to his family doctor, Dr. Gunther Rencken, complaining of chest pain that had been going on for the previous two weeks. Dr. Rencken noted:

> He notes that the chest pain is when he is active and moving around. If he stops and rests it gets better. He has had two stents placed in the past and has had similar symptoms right before he had his last heart attack. The pain and pressure lasts about 5 minutes before it eases up. He has not been using any nitroglycerine. He has had some dyspnea on exertion. He has a history of hypertriglyceridemia. He notes that this is making him quite depressed. He is worried that he is going to have another heart attack and he is just now been

5

>able to go back to work and stay active with work. He is still smoking.

(Tr. 287). Dr. Rencken made an immediate referral to cardiology and also prescribed nitro spray for chest pain (Tr. 287).

On May 31, 2012, the plaintiff presented to Dr. Kenneth Hanger for a cardiac evaluation. Dr. Hanger recommended a stress test and repeat angiogram (Tr. 349).

The plaintiff presented to Trident Medical Center for a cardiac catheterization on June 4, 2012. This study showed severe triple-vessel coronary artery disease, and bypass was recommended (Tr. 299). The plaintiff was immediately admitted to the hospital. On June 6, 2012, the plaintiff underwent triple bypass surgery performed by Dr. James Benner. The plaintiff was discharged from the hospital on June 11, 2012 (Tr. 305, 307).

At a followup appointment on June 20, 2012, Dr. Rencken noted that the plaintiff "was having some angina the last time I saw him. He went for a cath and then went on to triple bypass surgery. He is doing a lot better now. He is very painful. He has, however, lost his job and this has him quite depressed. He would like to see about doing something with this. He has not smoked since his surgery." Dr. Rencken refilled the plaintiff's prescription for Lortab for pain and increased the plaintiff's dosage of Wellbutrin for depression. At the time of this visit, Dr. Rencken noted that he believed the plaintiff "will come back strong from this and should be able to get back to work" (Tr. 286).

On June 27, 2012, Dr. Rencken completed a physician's report indicating that the plaintiff was temporarily disabled due to cardiac disease (Tr. 364).

The plaintiff followed up with Dr. Benner's office (his cardiac surgeon) on June 28, 2012. He complained of pain unrelieved by Lortab. He indicated that he was walking daily and denied shortness of breath. During this visit, his chest tube sutures were removed (Tr. 294). The plaintiff had refused cardiac rehabilitation "due to distance" (Tr. 293).

The plaintiff returned to Dr. Rencken on July 5, 2012, to followup on his depression and anxiety (Tr. 286). The plaintiff indicated to Dr. Rencken that he did not feel that the Wellbutrin was working very well and that he had started having some suicidal thoughts and was becoming more anxious. Dr. Rencken prescribed Celexa for him and also prescribed Valium for his anxiety. Dr. Rencken also took the plaintiff off Lortab as it was making him itchy and prescribed Ultram for pain instead. Dr. Rencken's medical records indicate that he added Restoril to the plaintiff's medication regimen on July 9, 2012 (Tr. 286).

On July 18, 2012, the plaintiff was treated for his anxiety and depression and also complained of continuing severe rib pain. Dr. Rencken noted that the plaintiff "is doing a little better with his depression. He is not suicidal. He has his family watching him very carefully. They have removed anything in the house that he can hurt himself with. He feels like the Celexa has helped some." Dr. Rencken increased his Celexa dosage and also prescribed Lasix for the plaintiff's lower extremity edema (Tr. 285).

At the referral of Dr. Benner, the plaintiff consulted with Dr. John Spratt at Trident Medical Center on July 27, 2012 (Tr. 309). Dr. Spratt noted that the plaintiff continued to do well from a cardiac standpoint but noted that the plaintiff has had "a good deal of difficulty with pain and muscle spasm across his anterior chest. He has been seen back in the clinic several times for this. He continues to have pain and stiffness across his anterior chest, but notes that it has improved since his last visit. His activity level has improved somewhat and he has been getting out of the house more" (Tr. 309). Dr. Spratt advised the plaintiff to carefully increase his activity and to contact Dr. Hanger's office to arrange routine cardiac followup (Tr. 309-310).

On August 3, 2012, Dr. Rencken completed a questionnaire indicating that the plaintiff would exhibit a slight work-related limitation in function due to his depression and anxiety (Tr. 313).

7

On August 30, 2012, the plaintiff treated with psychiatrist R. H. Payne, M.D., at the Charleston Family Center for his depression and anxiety. The plaintiff described taking Seroquel and stated it helped him to sleep more than usual but said that he was "meaner" the next morning. He described being on Depakote in the past but it made him more angry (Tr. 328).

On August 30, 2012, Dr. Rencken completed a physician's report indicating that the plaintiff was partially and temporarily disabled due to his chest wall pain (Tr. 363).

On September 13, 2012, the plaintiff complained to Dr. Payne of feeling like he had no gumption or ambition and feeling like he had been killed (Tr. 328-29).

Also on September 13, 2012, the plaintiff saw Dr. Rencken and complained of "still having a lot of chest wall pain" as well as "still battling with depression." Dr. Rencken noted that the plaintiff had been seeing the psychiatrist and had been on Seroquel. Dr. Rencken further noted that the plaintiff had been given a prescription for Thorazine, but the pharmacy called and noted this had multiple interactions that can cause cardiac dysrhythmias, so Dr. Rencken asked him to hold off on it. Dr. Rencken noted that the plaintiff was "still battling with depression. He feels like he is just a different person after they stopped his heart and woke him back up. At times he wishes he had just died. He is very short-tempered and easily gets angry. He recently destroyed his lawn mower with a sledgehammer when it would not start. He has not been suicidal or homicidal" (Tr. 362).

On September 27, 2012, the plaintiff complained to Dr. Payne of having discomfort around other people (Tr. 329).

Sunjay Kumar, M.D., performed a vocational rehabilitation examination on October 2, 2012, and found the plaintiff alert and oriented. The plaintiff had a non-tender chest, good chest aeration, and regular cardiovascular sinus rhythm. The plaintiff had full 5/5 motor power in the upper and lower extremities, a normal gait, full range of motion of all joints, and no difficulty getting on or off the exam table. Dr. Kumar described that the

plaintiff has had "significant depression, anger, suicidal ideation" and that he was on multiple antidepressant medications. Dr. Kumar went on to note that the plaintiff

> is having some problems with musculoskeletal pain depression. . . . He should have full recovery in my opinion. However it will take some time before he completely recovers. He may need alternative employment. He is unable to do much of the physical labor. Because of that his employer has told him that he has to be 100% when he comes back to the job. He is able to do daily chores of life however. He may not be able to sustain the demands of previous employment.

(Tr. 321-24).[2]

On October 3, 2012, Angela Saito, M.D., a state agency medical consultant, reviewed the plaintiff's medical records and opined regarding the plaintiff's physical functional capacity. Dr. Saito concluded that the plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for six hours in a workday, and sit for six hours in a workday. Dr. Saito further opined that the plaintiff had no limitations in pushing and pulling, beyond lifting and carrying limitations. Dr. Saito opined that the plaintiff could occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; balance frequently; occasionally stoop, kneel, crouch and crawl; should avoid concentrated exposure to extreme cold, heat, humidity; and avoid all exposure to hazards (Tr. 60-61).

On October 15, 2012, the plaintiff complained to Dr. Payne that he still was not able to sleep. At that time, Dr. Payne discontinued the plaintiff's prescription for Celexa and prescribed Risperdal (Tr. 330).

On October 25, 2012, the plaintiff returned to Dr. Payne and indicated he had experienced no improvement in his symptoms with the change of his medications (Tr. 352).

On November 14, 2012, the plaintiff returned to Dr. Rencken and complained of continuing chest discomfort after his surgery as well as increased depression. The

---

[2] From October 2010 until the plaintiff's heart surgery in 2012, he worked on a farm frequently lifting up to 50 pounds unloading boxes and pallets of fruit (Tr. 228-29).

9

plaintiff indicated to Dr. Rencken that his psychiatrist "basically told him that there is not much more for him to do. He would like to know about the possibility of Lithium." Dr. Rencken prescribed Effexor and also refilled his Lortab and Oxycodone (Tr. 339).

On November 15, 2012, Dr. Payne completed a questionnaire indicating that, despite good compliance, the plaintiff's depression was severe and his symptoms were resistant to treatment (Tr. 332). Dr. Payne went on to describe the plaintiff as having an angry affect, an irritable mood, audio and visual hallucinations, being moderately distractible, and having a moderate memory deficit. Dr. Payne noted that his "reactivity to people is such that he can't be around anyone for very long" (Tr. 333).

On November 16, 2012, Michael Neboschick, Ph.D., a state agency psychologist, reviewed the plaintiff's medical records and opined that the plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and no episodes of decompensation (Tr. 58). He opined that the plaintiff could carry out short and simple instructions; maintain regular work attendance and routine without special supervision; make simple work-related decisions; accept instructions and respond appropriately to a supervisor's criticism; and maintain socially appropriate behavior (Tr. 62-63). Dr. Neboschick opined that the plaintiff would have difficulty working in close proximity to or in coordination with co-workers and that he would be best suited for a job that did not require continuous interaction with the public (Tr. 63).

On November 29, 2012, the plaintiff returned to Dr. Payne for psychiatric treatment (Tr. 351).

On January 17, 2013, Dr. Rencken gave the same answers on a questionnaire regarding the plaintiff's mental condition as he gave on August 3, 2012. The plaintiff's mental diagnosis was anxiety and depression. Dr. Rencken opined that the plaintiff was oriented in all areas; his thought process was intact; thought content was

appropriate; the plaintiff's mood was normal; his attention, concentration and memory were good; he was capable of managing own funds; and the plaintiff's work-related functional limitation was slight (Tr. 342; *see* Tr. 313).

Dr. Payne's notes indicated that the plaintiff failed to show for appointments on January 3 and 10, 2013 (Tr. 351).

Dr. Rencken filled out family court forms in June and August 2012, January and December 2013, and February 2014 that indicated the plaintiff was "temporarily disabled" (Tr. 359, 361, 363, 364), but his November 2013 treatment notes stated, "I do think he is at least disabled over the next year or two, but probably permanently" (Tr. 355). On the January 17, 2013, court form, Dr. Rencken wrote that the plaintiff would be released to return to work on April 1, 2013 (Tr. 359).

On February 7, 2013, the plaintiff presented to Dr. Rencken complaining of ongoing chest wall pain and "still having a lot of depression." The plaintiff also described "a lot more swelling in his legs. Most of his issues are around his chest discomfort. He cannot reach or pick anything up. If he tries to pick up a gallon of milk he has extreme chest pain and cannot move. He is having so much discomfort that he wishes he had never done the surgery and had just died. He sleeps in a recliner" (Tr. 358).

On April 4, 2013, Dr. Payne completed a questionnaire regarding the plaintiff's mental condition. Dr. Payne marked that the plaintiff was oriented in all areas; thought process was intact; thought content was obsessive; mood was depressed and angry; attention, concentration, and memory were adequate; and the plaintiff was capable of managing own funds. Dr. Payne opined that the plaintiff's work-related functional limitation was serious due to depression (Tr. 346).

On April 6, 2013, the plaintiff underwent a lumbar MRI that revealed minimal degenerative disc disease in the lower lumbar spine with more pronounced right posterolateral protrusion at L4-5 causing minimal narrowing of the lateral recess and

11

moderate narrowing of the right neural foramina. The exam further indicated minimal left neural foraminal narrowing at L4-5 and bilaterally at L3-4 (Tr. 354).

On April 18, 2013, Dr. Rencken saw the plaintiff for chest wall pain, low back pain, depression, anxiety, coronary artery disease, high cholesterol, and anxiety. Dr. Rencken went on to note that the plaintiff "has not otherwise been doing very well. He is still having a lot of chest wall pain. He cannot look up and try and lift things. If he tries he has a lot of pain. He has also had some left leg numbness since he had the surgery. He has now started having the whole leg go numb. He is having low back pain. He notes that the leg feels weak at times and feels like it is giving in on him." Dr. Rencken assessed the plaintiff as having chest wall pain, left leg neuropathy, low back pain, depression, insomnia, coronary artery disease ("CAD"), hypercholesterolemia, and anxiety (Tr. 357).

On May 23, 2013, the plaintiff complained to Dr. Rencken of low back pain and some weakness in his legs as well as pain in his right hip and left leg and "a lot of chest wall pain." After reviewing his MRI with him, Dr. Rencken encouraged the plaintiff to see a surgeon (Tr 357).

On September 30, 2013, Dr. Rencken indicated that the plaintiff had chronic back pain with left leg pain as well as "severe ongoing chest wall pain" (Tr. 356).

On November 26, 2013, the plaintiff complained to Dr. Rencken of ongoing problems with right shoulder and arm pain. He also complained of some left leg numbness and ongoing back pain as well as continuing chest pain. Dr. Rencken noted that he was "still battling depression and feels that it might be getting worse. He does not want to adjust the medications quite yet. He has gone up on his Celexa back to 40mg recently and would like to see how that does first." Dr. Rencken assessed the plaintiff as having low back pain with bilateral radiculopathy, depression, right shoulder pain, and chest wall pain. Dr. Rencken went on to note that he believed that the plaintiff "is at least disabled over the next year or two, but probably permanently" (Tr. 355).

12

On February 20, 2014, Dr. Rencken completed another questionnaire indicating that the plaintiff was temporarily disabled due to his chronic chest wall pain, chronic back pain, and chronic right shoulder pain (Tr. 361).

The plaintiff's January 2013 function report indicated that he had no problem with his personal care, including dressing, bathing, shaving, feeding himself, and using the toilet (Tr. 240). At the administrative hearing, the plaintiff testified that he could not lift anything, had shortness of breath, could not be in a room with more than three to four people (Tr. 37-38), stayed tired (Tr. 44) and had dizzy spells (Tr. 47). The plaintiff also stated that he had pain up and down his leg and his leg would "go dead" (Tr. 41). The plaintiff testified that he could stand for 20 minutes and walk six-to-seven minutes (Tr. 45-46) and that he had to change positions after sitting for 20 minutes (Tr. 46). Approximately three times a month, the plaintiff drove himself to the doctor's office, which was 20-30 minutes away (Tr. 47).

## ANALYSIS

The plaintiff argues that the ALJ erred by failing to follow the treating physician rule.

### *Treating Physicians*

The plaintiff argues that his complaints to Drs. Rencken and Payne "are consistent throughout the medical records," the ALJ overestimated his level of functioning, the decision "is quite selective in choosing those medical records to which significant weight was afforded," and there does not exist persuasive contradictory evidence to rebut the opinions of Dr. Rencken and Dr. Payne that [the plaintiff] is disabled" (doc. 11 at 10).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the

13

examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### Dr. Payne

On April 4, 2013, Dr. Payne completed a questionnaire regarding the plaintiff's mental condition.  Dr. Payne marked that the plaintiff was oriented in all areas; thought process was intact; thought content was obsessive; mood was depressed and angry; attention, concentration, and memory were adequate; and the plaintiff was capable of

managing own funds. Dr. Payne opined that the plaintiff's work-related functional limitation was serious due to depression (Tr. 346).

The ALJ considered this opinion and gave it little weight (Tr. 24-25). The ALJ noted (Tr. 25) that Dr. Payne saw the plaintiff on approximately seven occasions for medication management – spanning approximately two months (Tr. 332), and his treatment notes do not reflect the severity indicated in the April opinion. Shortly after his treatment of the plaintiff concluded, Dr. Payne opined that improvement was expected (Tr. 332), but about five months later, without the benefit of a followup evaluation, he opined that the plaintiff's work-related functional limitation was serious (Tr. 346). Furthermore, the ALJ noted that Dr. Payne's opinion was inconsistent with Dr. Rencken's reports in August 2012 and January 2013 that the plaintiff had only slight mental limitations (Tr. 25; *see* Tr. 313, 342).

The ALJ also gave significant weight to the opinion of Dr. Neoboschick, a state agency psychologist (Tr. 24), who opined that the plaintiff was mildly limited and could perform a range of light work (Tr. 62-63). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in

the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the undersigned finds that the ALJ gave adequate reasons for his decision to give Dr. Payne's opinion little weight, and the finding is supported by substantial evidence.

### *Dr. Rencken*

On November 26, 2013, Dr. Rencken assessed the plaintiff as having low back pain with bilateral radiculopathy, depression, right shoulder pain, and chest wall pain. Dr. Rencken went on to note that he did not think the plaintiff was going to be able to do physical labor any more, and he believed that the plaintiff "is at least disabled over the next year or two, but probably permanently" (Tr. 355). The ALJ also considered this opinion and gave "some weight" to the portion of the opinion that the plaintiff was not capable of performing his past work (physical labor). However, he gave no weight to the opinion that the plaintiff was "probably disabled," as the opinion was not explained nor supported by the evidence of record (Tr. 24-25).

As noted above, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5. Further, Dr. Rencken's opinion that the plaintiff was "probably permanently" disabled was not accompanied by a narrative statement or supported by significant clinical findings (Tr. 24; *see* Tr. 355). In addition, Dr. Rencken's opinion was inconsistent with Dr. Kumar's opinion that the plaintiff could do daily chores and "should" make a full recovery (Tr. 322-24). As noted by the Commissioner, Dr. Rencken also contradicted himself: his family court opinions in June and August 2012, January 2013, and February 2014 that the plaintiff was "temporarily disabled" (Tr. 359, 361, 363, 364) chronologically bookend his November 2013 "permanently disabled" opinion. In addition, Dr. Rencken's treatment notes indicated that

the plaintiff was "fairly stable" on medication and improving (Tr. 255, 286, 309). Further, the ALJ gave significant weight to the opinion of state agency physician Dr. Saito (Tr. 24). Dr. Saito's opinion that the plaintiff could perform a range of light work was well supported and consistent with the record.

Based upon the foregoing, the undersigned finds that the ALJ gave adequate reasons for his decision to give Dr. Rencken's opinion that the plaintiff was probably permanently disabled no weight, and the finding is supported by substantial evidence.

### *Residual Functional Capacity*

Substantial evidence supports the ALJ's residual functional capacity ("RFC") finding that the plaintiff was capable of a range of light work. First, the ALJ pointed to the medical evidence regarding the plaintiff's physical functional abilities. The ALJ noted that in July 2012, the plaintiff was doing well, his activity level had improved, and he was getting out of the house more (Tr. 23; *see* Tr. 309). The ALJ noted that during Dr. Kumar's October 2012 physical exam, the plaintiff had no difficulty getting on and off the table (Tr. 23; *see* Tr. 322). He had full range of motion in all joints and full 5/5 motor power in the upper and lower extremities (*id.*). Dr. Kumar noted that the plaintiff was able to perform daily chores and predicted a full recovery (*id.*). As the ALJ found, Dr. Kumar suggested that the plaintiff would not be able to handle the physical demands of his past relevant medium exertional farm work (Tr. 25; *see* Tr. 323). The ALJ also noted that an April 2013 MRI of the lumbar spine showed only minimal degenerative disc disease (Tr. 24; *see* Tr. 353-54). Moreover, in October 2012, Dr. Saito, the state agency physician to whom the ALJ gave significant weight, concluded that the plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for six hours in a workday, and sit for six hours in a workday (Tr. 60). Dr. Saito opined that the plaintiff could occasionally climb ramps and stairs and stoop, kneel, crouch, and crawl (Tr. 61).

Second, regarding the plaintiff's mental functional abilities, the ALJ noted that in August 2012 and January 2013, Dr. Rencken opined that the plaintiff had only slight limitation due to a mental condition (Tr. 24; *see* Tr. 313, 342). On these dates, the plaintiff was well oriented; had good thought process and content; had a normal mood; and his attention, concentration, and memory were good (Tr. 313, 342). Additionally, Dr. Neboschick, the state agency psychological consultant to whom the ALJ gave significant weight, indicated that the plaintiff's daily activities and ability to maintain concentration, persistence, or pace were only mildly impacted by his mental condition (Tr. 58). Dr. Neboschick opined that the plaintiff could carry out short and simple instructions; maintain regular work attendance and routine without special supervision; and make simple work-related decisions (Tr. 62-63).

The ALJ also properly considered the plaintiff's subjective complaints, finding that while his medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 24). Specifically, while the plaintiff testified that he was unable to fully care for his personal needs or perform any household chores, his function report indicated that he had no trouble bathing, shaving, feeding himself, or using the toilet (Tr. 24; *see* Tr. 41-44, 240). Moreover, the ALJ noted that Dr. Kumar stated that the plaintiff was "able to do daily chores of life" (Tr. 324). The plaintiff testified that he had dizziness and motion sickness (Tr. 47), but the ALJ noted that there was no evidence that he ever reported these symptoms to his treating doctors (Tr. 24).

Based upon the foregoing, the ALJ's finding that the plaintiff could perform a range of light work is based upon substantial evidence.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>
United States Magistrate Judge

December 20, 2016
Greenville, South Carolina